# In the United States Court of Federal Claims

No. 18-925

Filed: March 21, 2024†

---

**JOSE GAMBOA-AVILA,**

    *Petitioner,*

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,**

    *Respondent.*

---

*Curtis R. Webb*, Curtis R. Webb, Attorney at Law, Monmouth, OR, for Petitioner.

*Colleen C. Hartley,* Assistant Director, *Traci R. Patton,* Assistant Director, *Heather L. Pearlman,* Deputy Director, *C. Salvatore D'Alessio,* Director, and *Brian M. Boynton,* Principal Deputy Assistant Attorney General, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    Dissimilar circumstances justify disparate outcomes. Jose Gamboa-Avila ("Mr. Gamboa"), petitioned for compensation pursuant to the Vaccine Act, alleging that he suffered from Guillain-Barre syndrome ("GBS")[1] after receiving the pneumococcal vaccine. (Pet., ECF No. 1). Specifically, Mr. Gamboa alleged he experienced fatigue, generalized body aches, headaches, insomnia, loss of strength, numbness, and facial paralysis. (*Id*. at 1–2). The Chief

---

† This Order was originally filed under seal on February 26, 2024. (ECF No. 95). The Court provided parties the opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than March 11, 2024. The parties failed to file a Joint Status Report requesting redactions. Thus, the sealed and public versions of this Order are identical, except for the publication date and this footnote.

[1] GBS is "a rare disorder in which your body's immune system attacks your nerves. Weakness and tingling in your hands and feet are usually the first symptoms. These sensations can quickly spread, eventually paralyzing your whole body." *Guillain-Barre syndrome*, Mayo Clinic, (last reviewed Dec. 22, 2023), https://www.mayoclinic.org/diseases-conditions/guillain-barre-syndrome/symptoms-causes/syc-20362793.

Special Master reviewed Mr. Gamboa's claim, ultimately concluding that Mr. Gamboa was not entitled to compensation because he did "not preponderantly establish[] that the pneumococcal vaccine can cause GBS—and this alone is a sufficient basis for dismissal." *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, No. 18-925, 2023 WL 6536207, at *1 (Fed. Cl. Spec. Mstr. Sept. 11, 2023), (Decision, ECF No. 84). Consequently, the Chief Special Master denied entitlement. *Id.* at *1, 32.

Mr. Gamboa seeks review, (ECF No. 86), arguing that the Chief Special Master impermissibly raised the burden of proof—requiring a higher burden than preponderance—so his decision should be reversed. (Mem. Mot. for Rev. ("Pet'r's Mem."), ECF No. 88).[2] As explained below, the Court denies Mr. Gamboa's Motion for Review and affirms the Chief Special Master's ruling.

## I.   Background

Mr. Gamboa received the pneumococcal vaccine on November 13, 2017 during a routine visit for his existing HIV-AIDS[3] diagnosis. *Gamboa-Avila*, 2023 WL 6536207, at *1 (citing Pet'r's Ex. 2 at 6–12, ECF No. 30-2). On November 27, 2017, Mr. Gamboa reported generalized body aches, a headache, night sweats, and numbness since his November 13 visit. (Pet'r's Ex. 2 at 17–21). The next day, Mr. Gamboa returned to his provider complaining of body aches (particularly leg and foot pain), facial numbness on his left side that began the night before, and insomnia. (*Id.* at 28). His physician noted that since the pneumococcal vaccine Mr. Gamboa "has generally felt unwell, described vague [symptoms] including . . . feel[ing] swollen, face/body feels numb, difficult to eat, [does not] taste food, legs hurt when he walks, hard to sit or stand for too long, [and] hand weakness. [Symptoms] affecting [right] side more than [left]." (*Id.*). Mr. Gamboa's physician also documented a mild right facial droop and reduced sensation on the left side of his face. (*Id.* at 29). However, Mr. Gamboa's physician noted that his strength remained intact in all extremities, and he exhibited a normal gait.

That night, November 28, Mr. Gamboa visited the emergency department complaining of facial numbness and weakness, lip swelling, difficulty talking and walking, and generalized body aches that he described as "tingly" and intermittent. (*Id.* at 31). The emergency physician noted that his "whole body pain and numbness" first began "about [five to six] days ago," (*id.*), thereby dating the onset of symptoms to on or around November 22 or 23. The emergency physician and Mr. Gamboa's HIV physician speculated the symptoms were caused by a recent medication change and/or vaccine. (*Id.* at 31 ("symptoms started about [five to six] days ago, after one of his

---

[2] The citations correspond with the Adobe-Acrobat Pro pagination, not the assigned page number on which the document appears.

[3] "Acquired immunodeficiency syndrome (AIDS) is a chronic, potentially life-threatening condition caused by the human immunodeficiency virus (HIV). By damaging your immune system, HIV interferes with your body's ability to fight infection and disease." *HIV/AIDS*, Mayo Clinic, (last reviewed Dec. 22, 2023), https://www.mayoclinic.org/diseases-conditions/hiv-aids/symptoms-causes/syc-20373524.

ART meds was switched and he received a pneumovax shot"), 33–34 ("HIV [physician] believes this is possibly caused by a recent change to his medication regimen")).

Mr. Gamboa's physicians hospitalized him from November 30 to December 9, 2017, and diagnosed Mr. Gamboa with GBS. (*Id.* at 50, 54, 57, 63–64, 96, 192–93). Throughout his hospitalization, Mr. Gamboa's treaters continued to note his symptoms in relation to both a change in medication and the pneumococcal vaccine. (*E.g., id.* at 57 ("symptoms coincide with recent change in ART meds and pneumovax administration"), 59 ("unclear if patient's neuropathic symptoms are 2/2 medication changes or pneumovax"), 71 ("received [pneumococcal vaccine] on November 13, also switched [medications] on that day"), 87 ("admitted with recent onset facial diplegia[4] and paresthesias[5] . . . [v]accine may have been trigger"), 94 ("presenting with generalized pain and facial weakness which developed [one week] after receiving pneumococcal vaccine . . . was originally switched to [different medication] on same clinic visit that vaccine was received), 102 ("vaccine may have been trigger")).

Mr. Gamboa petitioned for vaccine compensation on June 27, 2018, claiming the pneumococcal vaccine caused his GBS, entitling him to compensation under the Vaccine Act. (*See generally* Pet.). Under the Vaccine Act, petitioners may demonstrate eligibility for an award through two methods: (1) an injury listed on the Vaccine Injury Table occurred within the requisite period, or (2) an unlisted injury was caused-in-fact by a vaccine listed on the Table. 42 C.F.R. § 100.3; 42 U.S.C. § 300aa-11(c)(1)(C). Here, Mr. Gamboa petitioned for an unlisted injury, so he was required to establish causation. To establish actual causation, Mr. Gamboa was required to "show by preponderant evidence" (1) a medical theory connecting the vaccination and injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of Health & Hum. Servs.*, 418 F. 3d 1274, 1278 (Fed. Cir. 2005). The Chief Special Master determined that Mr. Gamboa failed to preponderantly establish that his specific pneumococcal vaccine can cause GBS. *Gamboa-Avila*, 2023 WL 6536207, at *1–2, 42.

The Chief Special Master's finding that Mr. Gamboa failed to satisfy *Althen* prong one chiefly relied on a review of scientific literature and expert testimony. *Id.* at *2–19, 26–29. Mr. Gamboa's expert, Dr. Lawrence Steinman ("Dr. Steinman"),[6] advanced a theory that "the pneumococcal vaccine contains a 'molecular mimic' relevant to the pathogenesis [(development)] of GBS[;]" in other words, the vaccine contains molecules that confuse the body into attacking its own nervous system's myelin, leading to GBS. *Id.* at *2 (quoting First

---

[4] Diplegia is when "[p]aralysis occurs on the same area on both sides of the body. For example, paralysis affects both arms, both legs or both sides of the face." *Paralysis*, Cleveland Clinic, (last reviewed Dec. 22, 2023), https://my.clevelandclinic.org/health/diseases/15345-paralysis.

[5] Paresthesia is "the feeling of tingling, numbness or 'pins and needles.'" *Paresthesia*, Cleveland Clinic, (last reviewed Dec. 22, 2023), https://my.clevelandclinic.org/health/symptoms/24932-paresthesia.

[6] Admitted as expert in neurology. *Gamboa-Avila*, 2023 WL 6536207, at *2.

3

Steinman Rep. at 11, ECF No. 38); (*see also* Pet'r's Mem. at 8–9 (outlining four element theory[7] connecting pneumococcal vaccine to GBS)). Dr. Steinman attempted to show that molecular mimicry led to Mr. Gamboa's GBS, by testifying (based on his own research) that specific phospholipids—phosphoglycerol and phosphocholine—are present in both the pneumococcal vaccine and nerve myelin that are "targeted by antibodies in neuroinflammation." *Id.* at *3–5 (quoting First Steinman Rep. at 13–14, 19). He continued that the pathogenic antibodies "are found" in the pneumococcal vaccine and are known to be associated with GBS. *Id.* at *4 (citing First Steinman Rep. at 19).

Dr. Steinman also cited literature to support his molecular mimicry theory, including Ho who studied fatty acids of the myelin sheath that resolve neuroinflammation and Gilburd to show that "the antibodies of the kind that would (theoretically) be produced by the pneumococcal vaccine are known to be associated with GBS." *Id.* at *3–4 (citing Pet'r's Ex. 22, ECF No. 27-1 ("Ho"); Pet'r's Ex. 27, ECF No. 41-1 ("Gilburd")). However, the Chief Special Master determined the literature did not necessarily advance Dr. Steinman's theory. *Id.* at *3–10. For example, Ho studied the autoimmune response in multiple sclerosis ("MS"),[8] not GBS, and Gilburd noted that the antibodies in GBS have not been proven to induce nerve damage. *Id.* at *3–4. Further, Dr. Steinman cited two case reports that linked pneumococcus with GBS, but the Chief Special Master found that "both case report's authors admitted that no such association had even been scientifically established." *Id.* at 5–6 (citing Pet'r's Ex. 40, ECF No. 56-1 ("El Khatib"); Pet'r's Ex. 27, ECF No. 56-2 ("Yuki")). Dr. Steinman also cited Nakos, which sampled the blood of nine patients with an "acute inflammatory demyelinating polyneuropathy"[9] GBS variant. *Id.* at *4, 6 (citing Pet'r's Ex. 28, ECF No. 41-2 ("Nakos")). Nakos found that a

---

[7] Dr. Steinman theorizes that: "1. The human immune system targets the phosphoglycerol and phosphocholine polar head groups in lipids in the central nervous system of some patients with [MS]. 2. Pneumococcal conjugate vaccine (Prevnar 13) generates an immune response to the phosphoglycerol and phosphocholine moieties in the polysaccharide capsule of several serotypes of the streptococcus pneumonia bacteria. 3. Phosphoglycerol and phosphocholine containing lipids in the peripheral nervous system are targets of the aberrant immune response in some cases of GBS. 4. The immune response that targets the phosphoglycerol or phosphocholine moiety of the polysaccharide capsule of streptococcus pneumonia bacteria can also, on rare occasions, target the phosphoglycerol or phosphocholine moiety in the myelin of lipids in the peripheral nerves and cause [GBS]." (Pet'r's Mem. at 8–9).

[8] MS "causes damage to nerve fibers in the central nervous system. Over time, it can lead to vision problems, muscle weakness, loss of balance or numbness." *Multiple Sclerosis (MS)*, Cleveland Clinic, (last reviewed Jan. 11, 2024), https://my.clevelandclinic.org/health/diseases/17248-multiple-sclerosis.

[9] Acute inflammatory demyelinating polyneuropathy (AIDP), also known as polyradiculoneuropathy, is an autoimmune disorder characterized by the rapid onset of weakness and sensory loss in the limbs due to inflammation and damage to the peripheral nerves' myelin sheath. *Acute inflammatory Demyelinating Polyneuropathy, Polyradiculoneuropathy (AIDP)*, Yale Medicine, (last reviewed Jan. 22, 2024) https://www.yalemedicine.org/clinical-keywords/acute-inflammatory-demyelinating-polyneuropathy-polyradiculoneuropathy.

"wide range" of antibodies were observed, although the precise role of the antibodies' in the development of GBS was not determined. *Id*. Put simply, Nakos showed that antibodies were *present* in patients with GBS, including one with a phosphoglycerol component, but were not proven to *cause* GBS. *See id.*

Following pushback from the Secretary's expert, Dr. Steinman advanced another distinct theory that "the pneumococcal vaccine could theoretically cause GBS *even if* a natural pneumococcal infection could not, because 'the vaccine is very different from the microbe itself.'" *Id.* at \*7 (citing Third Steinman Rep. at 3, 17–18, 23–29) (emphasis in original). Dr. Steinman testified that the conjugated vaccine—a type of vaccine that only uses a portion of the germ and coats that germ in a polysaccharide (a sugar)[10]—contained an additional mimic that could cause GBS. *Id.* at \*7–8 (citing Third Steinman Rep. at 24). Dr. Steinman opined that mimic would likely spark an immune response, leading to the body to attack its own myelin. *See id.* at \*7–9.

The Secretary's expert, Dr. J. Lindsay Whitton ("Dr. Whitton"),[11] testified that it is unlikely the pneumococcal vaccine would cause GBS. *Id.* at \*10. He explained that because of sugar and protein molecules in the pneumococcal vaccine, the vaccine "can only 'teach' the immune system to respond to specific strains it 'sees' (based on the strains in the vaccine), with each being separate." *Id.* (citing First Whitton Rep. at 5, ECF No. 44-1). Dr. Whitton continued that triggering GBS was "quite strain-specific" and that *S. pneumoniae*, at issue here, was not associated with GBS. *Id.* at \*12 (quoting First Whitton Rep. at 8). Dr. Whitton distinguished the polysaccharide capsules in *S. pneumoniae*—which are "gram positive" or "thick"—with those of *C. jejuni*—which are "gram negative" or "thin"—because *C. jejuni* is known to be associated with GBS. *Id.* (citing First Whitton Rep. at 7–10). Dr. Whitton contended that because of the capsule differences, the pneumococcal vaccine lacks the molecular structure understood to cause GBS, so it is improbable that the vaccine caused Mr. Gamboa's GBS. *Id.* at \*12–13. Dr. Whitton also distinguished GBS from MS, arguing that the diseases do not have a common pathogenesis, so MS-focused literature (like Ho) is not relevant to Mr. Gamboa's condition. *Id.* at \*13. The Chief Special Master found Dr. Whitton's rebuttal convincing. *Id.* at \*10–15, 26–29.

The Chief Special Master also looked to prior decisions to determine that Mr. Gamboa failed to satisfy *Althen* prong one. *Id.* at \*24–25. Specifically, the Chief Special Master noted that Mr. Gamboa relied on unpersuasive theories and literature used in other cases. *Id.* In *Bielak* and *Trollinger*, petitioners relied on nearly all the same literature as Mr. Gamboa to argue that

---

[10] Conjugate vaccines "use only portions of the germ. Many bacteria molecules are coated by a sugar called polysaccharide. This coating hides or disguises the germ (antigens) so that the immature immune systems of infants are not able to recognize it. Therefore, scientists attach the polysaccharide to a stronger protein. When the immune system responds to the protein, it also responds to the polysaccharide. Examples include . . . Pneumococcal Conjugate Vaccine (Prevnar®)." *Types of Vaccines)*, Health.mil, (last reviewed Jan. 22, 2024), https://www.health.mil/Military-Health-Topics/Health-Readiness/Immunization-Healthcare/Clinical-Consultation-Services/Types-of-Vaccines.

[11] Admitted as expert in immunology. *Gamboa-Avila*, 2023 WL 6536207, at \*10.

phosphoglycerol in the vaccine caused antibodies to attack myelin. *Id.* at *25 (citing Ho, Gilburd, & Nakos (distinguished above)); *Trollinger v. Sec'y of Health & Hum. Servs.*, No. 16-473V, 2023 WL 2521912, at *25 (Fed. Cl. Spec. Mstr. Feb. 17, 2023), *mot. for review denied,* No. 16-473, 2023 WL 5249583 (Fed. Cl. Aug. 15, 2023)*; Bielak v. Sec'y of Health & Hum. Servs.*, No. 18-761V, 2022 WL 18058244, at *34 (Fed. Cl. Spec. Mstr. Dec. 9, 2022. Further, in *Deshler*, the Chief Special Master rejected the petitioner's theory, also advanced by Mr. Gamboa, that the conjugate component of the vaccine caused an autoimmune response relating to the vaccine's antigens. *Gamboa-Avila*, 2023 WL 6536207, at *25; *Deshler v. Sec'y of Health & Hum. Servs.*, No. 16-1070V, 2020 WL 4593162 (Fed. Cl. Spec. Mstr. July 1, 2020). The Chief Special Master concluded that Dr. Steinman's theory is "unreliable and persuasive." *Gamboa-Avila*, 2023 WL 6536207, at *26–32. Accordingly, the Chief Special Master determined Mr. Gamboa did not carry his *Althen* prong one burden of proof[12] and, therefore, was not entitled to compensation under the Vaccine Act.

## II. Analysis

Under the Vaccine Act, the Court of Federal Claims reviews a special master's decision upon the timely request of either party. *See* 42 U.S.C. § 300aa-12(e)(1)–(2) (2018). In motions to review, the Court must determine if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 42 U.S.C. § 300aa-12(e)(2)(B). The Court applies the arbitrary and capricious standard to factual findings and reviews all legal conclusions de novo. *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992). When the Court reviews mixed questions of law and fact, it must determine whether answering it primarily involves legal or factual work. *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018) (involving determination by bankruptcy court).

Importantly, the Court does not "reweigh the factual evidence," or "assess whether the special master correctly evaluated the evidence." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Munn*, 970 F.2d at 871). Neither does the Court "examine the probative value of the evidence or the credibility of the witnesses." *Id.* Rather, the Court upholds the special master's decision if they "considered the relevant evidence of record, dr[ew] plausible inferences and articulated a rational basis for the decision[.]" *Hines on behalf of Sevier v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991) (holding that "reversible error [is] extremely difficult to demonstrate"). The standard of review is "highly deferential." *Cucuras v. Sec'y of Dep't of Health & Hum. Servs.*, 26 Cl. Ct. 537, 541 (1992), *aff'd*, 993 F.2d 1525 (Fed. Cir. 1993). The Court cannot "substitute its judgment for that of the special master merely because it might have reached a different conclusion." *Snyder v. Sec'y of Dep't of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009).

To determine causation, the special master and this Court apply the *Althen* test, listed above. 418 F.3d at 1278. A petitioner must satisfy all three prongs to demonstrate causation-in-fact. *Id.* at 1274. Under *Althen* prong one, the petitioner must provide a "reputable medical

---

[12] Because the Chief Special Master determined that Mr. Gamboa did not establish prong one of *Althen*, he did not address prongs two or three. *See generally Gamboa-Avila*, 2023 WL 6536207.

theory" that the vaccine at issue *can* cause the type of injury alleged. *Id.* at 1278; *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). Petitioner's medical theory must be supported by "sound and reliable medical or scientific explanation[,]" however, medical or scientific certainty is not required. *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548–49 (Fed. Cir. 1994). Further, mere plausibility of petitioner's medical theory is insufficient. *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) ("[h]owever, in the past we have made clear that simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof" (*quoting Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010))). When evaluating expert testimony, a special master "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Ultimately, special masters must determine whether the medical theory advanced by the petitioner and their expert is "more probable than not[.]" *Althen*, 418 F.3d at 1279–80 (citing *Hellebrand v. Sec'y of Health & Hum. Servs.*, 999 F.2d 1565, 1572–73 (Fed. Cir. 1993)).

Mr. Gamboa challenges the Chief Special Master's decision on one ground, that the Chief Special Master impermissibly raised the burden of proof to determine Mr. Gamboa did not satisfy *Althen* prong one. (Pet'r's Mem. at 12–27).[13] Specifically, Mr. Gamboa asserts the Chief Special Master required scientific certainty by improperly comparing Mr. Gamboa's claim to a vaccine table injury, requiring more fulsome evidence than necessary, and discounting GBS-specific medical science. (*Id.* at 14–19). Mr. Gamboa also argues the Chief Special Master impermissibly required epidemiological evidence connecting the pneumococcal disease or vaccine conjugate to GBS. (*Id.* at 20–24). Further, Mr. Gamboa argues the Chief Special Master did not give proper weight to the opinions of Mr. Gamboa's treating physicians. (*Id.* at 24–27). Mr. Gamboa requests that this Court reverse the Chief Special Master's decision and remand the petition to apply the correct burden of proof. (*Id.* at 27). The Secretary argues the Chief Special Master applied the correct standard of preponderance to *Althen* prong one, and his factual findings were not arbitrary and capricious. (Resp't's Resp. at 11–21, ECF No. 90). The Court agrees with the Secretary.

---

[13] Mr. Gamboa asserts that the Chief Special Master required a higher burden of proof than other special masters who determined the pneumococcal vaccine was causally connected to GBS. (*Id.* at 12–14 (citing *Gross v. Sec'y of Health & Hum. Servs.*, No. 17-1075V, 2022 WL9669651 (Fed. Cl. Spec. Mstr., Sept. 22, 2022), *Maloney v. Sec'y of Health & Hum. Servs.*, No. 19-1713, 2022 WL 1074087 (Fed. Cl. Spec. Mstr., March 17, 2022), *Pierson v. Sec'y of Health & Hum. Servs.*, No. 17-1136V, 2022 WL 322836 (Fed. Cl. Spec. Mstr. Jan. 19, 2022) (*Koller v. Sec'y of Health & Hum. Servs.*, No. 16-439V, 2021 WL 5027947 (Fed. Cl. Spec. Mstr. Oct. 8, 2021))). The Chief Special Master explained that the other special masters' decisions "may reflect instances in which the proper evidentiary standard was inadvertently *lowered*" so his review was more rigorous. *Gamboa-Avila*, 2023 WL 6536207, at *31 (emphasis added). The Court will address the burden of proof in more detail below, but notes that special masters are not bound by the decisions of their colleagues. *Boatmon*, 941 F.3d at 1358–59.

7

As an initial matter, Mr. Gamboa's argument that the Chief Special Master impermissibly raised his burden of proof by requiring scientific certainty is a mixed question of law and fact. (Pet'r's Mem. at 14–19). When faced with a mixed question, the Court must determine whether answering it primarily involves legal or factual work. *See U.S. Bank Nat. Ass'n*, 138 S. Ct. at 967. Here, Mr. Gamboa disguises a factual disagreement as a legal challenge. *See e.g., Echols v. Sec'y of Health & Hum. Servs.*, 165 Fed. Cl. 9, 17 (2023).

First, Mr. Gamboa argues that the Chief Special Master raised the burden of proof beyond preponderance by comparing the quality of his evidence to evidence connecting the flu vaccine to GBS and invoking evidence linking the Epstein-Barr virus to MS. (Pet'r's Mem. at 14–17). Mr. Gamboa identifies that a flu vaccine is a Vaccine Table Injury and argues that robust evidence connecting the flu vaccine with GBS comes from studies that are "rare in science." (*Id.* at 15). Mr. Gamboa also asserts that the scale of the study proving with scientific certainty that the Epstein-Barr virus causes MS far exceeds the preponderance standard. (*Id.* at 16–17 (referencing study of "more than [ten] million young adults" to test causal connection between the Epstein-Barr virus and MS)). Therefore that "degree of certainty" should not be applied to literature studying the connection between the pneumococcal vaccine and GBS. (*Id.* at 15 (citing 42 CFR § 100.3(a)XIV(D) and (b)(15)). Mr. Gamboa mischaracterizes the Chief Special Master's decision.

The Chief Special Master did not "require" Mr. Gamboa to produce comparable evidence. *Gamboa-Avila*, 2023 WL 6536207, at *24–31. Rather, the flu and Epstein-Barr evidence illustrated the relative weakness of the medical literature provided by Mr. Gamboa. *Id.* at *27 n.37 (asserting the robustness of those studies "underscore the comparative lack of comparable reliable proof *in this case*."). As explained above, Mr. Gamboa provided medical literature that discussed MS (Ho), failed to establish an association between pneumococcus and GBS (El Khatib), and did not identify the precise role of antibodies in GBS's development (Nakos). *Id.* at *4–6, 10, 25, 27–28, 31. Accordingly, evidentiary comparisons did not raise Mr. Gamboa's burden of proof but underscored the weakness of Mr. Gamboa's theory.

Further, Mr. Gamboa argues the Chief Special Master disregarded the value of those studies and their specificity to GBS. (Pet'r's Mem. at 17–19). Specifically, Mr. Gamboa argues Ho was reliable because it showed how the immune systems of people with MS target phospholipids, and such knowledge can "help us understand other demyelinating diseases" like GBS. (*Id.* at 18). Similarly, Mr. Gamboa argues that Nakos was reliable because it identified anti-phospholipid antibodies in GBS patients, which supported Dr. Steinman's molecular mimicry theory. (*Id.* at 19). However, it is not the role of the Court to "reweigh the factual evidence" or second-guess the special master's scientific evaluation. *Lampe*, 219 F.3d at 1360. So long as the Chief Special Master "considered the relevant evidence of record, dr[ew] plausible inferences and articulated a rational basis for the decision," the Court will not disrupt his decision. *Hines*, 940 F.2d at 1528. Here, the Chief Special Master discussed at length how and why he was unconvinced that those studies established the pneumococcal vaccine could cause GBS. *Gamboa-Avila*, 2023 WL 6536207, at *26–29. The Court agrees. Thus, the Chief Special Master did not raise Mr. Gamboa's burden of proof or arbitrarily or capriciously reject his evidence.

Second, Mr. Gamboa argues that the Chief Special Master required epidemiological evidence connecting the pneumococcal disease and/or conjugate vaccine to GBS. (Pet'r's Mem. at 20–24). Mr. Gamboa asserts that the absence of epidemiological evidence was considered a "critical flaw" in his medical theory. (*Id.* at 20). Here again, the Chief Special Master did not "require" epidemiological evidence nor impermissibly raise Mr. Gamboa's burden of proof. The Chief Special Master did not violate *Capizzano* where the Federal Circuit held that "requiring either epidemiologic studies . . . or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect" is contrary to *Althen*. *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325 (Fed. Cir. 2006) (internal citation omitted). Instead, the Chief Special Master noted the lack of epidemiological evidence, particularly given the relative weakness of the literature provided by Mr. Gamboa to show the pneumococcal vaccine can cause GBS. *Gamboa-Avila*, 2023 WL 6536207, at *26–29. Again, the Court declines to reweigh the Chief Special Master's factual findings.

Lastly, Mr. Gamboa argues the Chief Special Master failed to "seriously consider" the medical opinions of Mr. Gamboa's treating physicians. (Pet'r's Mem. at 24–27). Mr. Gamboa emphasizes that multiple physicians speculated the pneumococcal vaccine "triggered" his GBS. (*Id.* (citing Pet'r's Ex. 2 at 30, 59, 72, 76, 155)). Mr. Gamboa argues that such language provides "clear evidence" that Mr. Gamboa's physicians recognized a potential connection between the pneumococcal vaccine and GBS diagnosis. (*Id.* at 25–26). Mr. Gamboa further argues that although the Chief Special Master acknowledged those medical records were relevant to *Althen* prong one, he disregarded them because they did not display "scientific certainty." (*Id.* at 26). This is purely an issue of fact.

To be upheld by this Court, the Chief Special Master need only consider relevant evidence, make plausible inferences, and articulate a rational basis for the decision. *See Hines*, 940 F.2d at 1528. Generally, medical records are considered trustworthy evidence and given substantial weight. *Cucuras*, 993 F.2d at 1528; *e.g., Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, physician notes largely focused on temporality do not relieve the petitioner from providing "a reputable medical or scientific explanation that pertains specifically to [his] case," *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010) (quoting *Knudsen*, 35 F.3d at 548–49). Here, the Chief Special Master weighed the opinions of Mr. Gamboa's treating physicians against the medical literature and Dr. Whitton's testimony to determine Mr. Gamboa failed to establish the pneumococcal vaccine can cause GBS. *Gamboa-Avila*, 2023 WL 6536207, at *28. Specifically, he found that the physicians' notes were speculative and not informed by the level of scientific specificity found in the medical literature provided by both Mr. Gamboa and the Secretary. *Id.*

Mr. Gamboa's physicians noted there could be a connection between the pneumococcal vaccine and his GBS but advanced other theories as well. (*E.g.,* Pet'r's Ex. 2 at 57 ("symptoms coincide with recent change in ART meds and pneumovax administration"), 59 ("unclear it patient's neuropathic symptoms are 2/2 medication changes or pneumovax"), 71 ("received [pneumococcal vaccine] on November 13, also switched [medications] on that day")). Therefore, the Chief Special Master was within his purview to weigh the factual evidence and examine its probative value. *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). When the finding of fact is "based on evidence in the record that [is] not wholly implausible,

[this Court is] compelled to uphold the finding as not being arbitrary or capricious." *Porter*, 663 F.3d at 1249 (internal citation omitted). The Chief Special Master plausibly found that Mr. Gamboa's physician notes were less convincing than the Secretary's evidence, explained above. Accordingly, the Court upholds the factual findings as neither arbitrary nor capricious.

Based on the foregoing, the Court finds that the Chief Special Master considered the relevant evidence of record, drew plausible inferences, and articulated a rational basis for his decision that Mr. Gamboa failed to satisfy the preponderance standard. Accordingly, the Chief Special Master's September 11, 2023 ruling was not arbitrary, capricious, an abuse of discretion, or contrary to law.

### III.   Conclusion

For the stated reasons, the Court hereby **DENIES** Mr. Gamboa's Motion for Review, (ECF No. 86), and **AFFIRMS** the Chief Special Master's September 11, 2023 decision. The Clerk is directed to enter judgment accordingly.

The Court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all parties agree. Per Vaccine Rule 18(b), no later than March 11, 2024, the parties shall file a joint status report indicating their agreement with the proposed redactions, attaching a copy of those pages of the Court's ruling containing proposed redactions, with all proposed redactions clearly indicated.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge